Harper, J.
I shall first consider that which perhaps constitutes the only difficult or material subject of investigation in the case — the question, whether the bill for the specific performance of this contract can be maintained in this Court, which constitutes the sixth ground of the appeal. The cases of Pusey v. Pusey, 1 Tem. 273; of Duke of Somerset v. Cookson, 3 Pr. Wms. 390; Buxton v. Lister, 3 Atk. 383; Fells v. Read, 3 Ves. 70; Loyd v. Loaring, 6 Ves. 778; Lowther v. Lowther, 13 Ves. 95; and Macclesfield v. Davis, 3 Ves. & B. 16, put it out of the question that a bill will lie in many cases for the specific delivery of a chattel.
*108 It seems to have been a matter of some uncertainty in our own decisions, whether a bill may be maintained for the specific delivery of a slave, and in what cases ; and it is desirable that we should come to some specific conclusion on the subject. The general principle on which the decisions go is, that where damages will not-be an adequate compensation, the party is not entitled to relief in equitjr. But the principle might perhaps be more broadly stated. The method of relief on contracts in equity, is to carry them into specific execution, and it is laid down in the text of Fonblanque, B. 1, Ch. iii. sec. 1, that “where the contract is good at law, equity will carry it into execution. ” The commentator on Fonblanque, ib. n. c. observes, “ this proposition is too generally stated; for though equity will enforce the specific performance of fair and reasonable contracts, where the party wants the thing in specie and cannot have it in any other way; yet, if the breach of the contract can be, or was intended to be compensated in damages, Courts of Equity will not interpose.” In general, where the contract related to personalty, the party was not supposed to want a specific execution, and no doubt very much for the reason assigned in the same chapter, “that chattels were of little value at the common law, when personal property was but small.”
The principle may be illustrated by the cases in which specific performances of such contracts has been refused. In Cud v. Rutter, I Pr. Wms. *1341 510,' where the contract was for the transfer of stock, *the reason-J ing of the Chancellor was, “that a Court of Equity ought not to execute any of these agreements, but to leave them to law where the party is to recover damages, and with the money may, if he pleases, buy the quantity of stock agreed to be transferred to him ; for there can be no difference between one man’s stock and another’s. It is true, one parcel of land may vary from and be more commodious, pleasant or convenient than another parcel of land, but £1000 South Sea Stock, whether it be A, B, or C’s, is the same thing, and in no sort-variant.” Yet in Colt v. Netterville, 2 Pr. Wms. 304, where the bill was to have a transfer of stock which was rising rapidly in value, the Chancellor seemed to doubt whether justice did not require the transfer to be decreed. In Errington v. Aynesly, 2 Br. C. C. 343, the Master of the Rolls, refusing specific performance of an agreement to build a bridge, says, “ there is no case of a specific performance of an agreement to build a house, because, if A will not do it, B may. A specific performance is only decreed where the party wants the thing in specie, and cannot have it in any other way.”
In the cases of the Pusey horn, of the antique altar-piece which had been long in the family, of the ornamented silver tobacco-box, the property of a club, and some others, it was only the feelings and imagination of the owners, giving the articles a peculiar value to them, which a jury, fixing the market value, could not be supposed to estimate, that was held to entitle them to relief. In Fells v. Read, the Chancellor remarks in relation to'those cases : “It was not to be cast to the estimation of people who have not those feelings. In all cases where the object of the suit is not liable to a compensation by damages, it would be strange if the law of this country did not afford any remedy. It would be great injustice if an individual cannot have his property without being liable to the estimate of people who have not his feelings upon it.” In Buxton v. Lister, a dif *109 ferent class of cases is considered. The case of Taylor v. Neville, is referred to:
“ That was for a performance of articles for sale of eight hundred tons of iron, to be paid by instalments, and a specific performance was decreed.
“ There are several circumstances which may concur.
“ A man may contract for the purchase of a great quantity of timber, as a ship carpenter, by reason of the vicinity of the timber.
“ On the part of the seller, suppose a man wants to clear his land, in order to turn it to a particular sort of husbandry, here nothing L' can answer the justice of the case, but the performance of the contract in specie.
“In the case of John, Duke of Buckinghamshire v. Ward, a bill was brought for the specific performance of a lease relating to Alum Works and the trade thereof, which would be greatly damaged if the covenant was not performed on the part of Ward.
“The covenants lay there in damages, and yet the Court considered, if they did not make such a decree, an action afterwards would not answer the justice of the case. ”
The general principle is, that the Court will execute any fair and reasonable agreement, unless it appears that full justice may be done by a compensation in damages. Now, if these numerous and uncontradicted decisions are evidence of the law, then it is certain that there may be some cases in which a bill will lie for the.specific delivery of a slave. Suppose the case, which I have known, of a slave accustomed to wait on a deaf and dumb person, and from long habit able to communicate ideas with him. This would add nothing to his market value, though rendering him inestimable to his owner. Many similar cases may be conceived. A slave may have been the nurse of her master’s children, or may have saved the life of one of his master’s family. In such cases, what mockery would it be to tell the master that he might have full compensation by damages for the loss of the slave ? And unless there be something very perverse in the disposition of the master or the slave, in every instance where a slave has been reared in a family, there exists' a mutual attachment between the members of it and himself. The tie of master and slave is one of the most intimate relations of society. In every age the distinction has been recognized between the slave brought up in his master’s household and one casually acquired. And it may be said, that such an one is actually of more value to the master than he would be to a stranger. The owner better understands his qualities, and what he is capable of performing, and the slave will be more likely to serve with cheerfulness and fidelity. These considerations are greatly strengthened by that of humanity to the slave himself. Are not such feelings worthy of more regard than the taste which would covet-an antique altar-piece or a picture of Titian ? We have the principle from the English decisions, but an infinitely stronger case in which to apply it.
In the case before us, it appears that the slaves in question were „„ brought up in the family of the plaintiffs, and according to the L view I have taken, this makes the case in which a bill may be maintained. But it is argued that this may lead to very extensive consequences. Though not strictly born and reared in the master’s family, yet there may be the same attachment and the same circumstances to give a peculiar *110 value, from a shorter ownership. Slaves are moral and intellectual beings, having qualities infinitely diversified, and in every case where specific slaves are contracted for, it might be said that the contract was made with a view to those peculiar qualities. But I am not to shrink from enforcing a well-settled principle of law, because it may lead to unforeseen consequences. I believe these consequences will follow, and I am prepared to lay it down as a general rule, that a hill will lie for the specific delivery of slaves, as for the specific performance of a contract for the sale of land; and in saying this, I believe I am giving effect to the law, according to its true meaning.
We have seen that the principle is, that equity'will enforce contracts specifically, unless it appear that there may be full compensation in damages. But this cannot appear in the case of slaves, any more than in a contract for the sale of land.
In case of the purchase of land, it is presumed that the party was induced by some particular liking, or some convenience in the particular land. But there is as great, and perhaps greater reason for supposing that a purchaser of specific slaves has a view to their peculiar qualities.
The objection at common law, that chattels were of little value, does not apply to these. They are a property no less permanent and valuable than the land itself. It is said in Buxton v. Lister, “As to cases of contracts for purchase of lands, or things that relate to realities, those are of a permanent nature, and if a person agrees to purchase them, it is on a particular liking to the land, and is quite a different thing from matters in the way of trade.” Does not this apply equally to slaves ? Can you say, as in the cases which relate to stock, that one man’s slave is as good .as another man’s slave ? It may chance to be so ; as it might happen that a man might with the damages recovered for a breach of contract to sell land, buy other land equally convenient and agreeable; but this is not generally so, nor so to be presumed. The fair presumption is, that when a man contracts for particular slaves, he wants to have them in specie.
*1 *With us slaves are commonly employed on land. Suppose a J man at the same time to contract for land and the slaves employed upon it; it would be nugatory, and defeat his object altogether, to give him the land, if he could not have the slaves. The cases are so many and various in which justice could only be done by a specific delivery, that it is best to have a general and certain rule. It is on such views I suppose, that the same doctrine has been established in other States where slavery exists. Cases to this effect were quoted from Kentucky and North Carolina — 4 Bibb, 186; 2 Bibb, 410; 2 Murphy, 14.
There may be exceptions to the rule. If it appeared that the purchaser contracted for the slaves as merchandise to sell again, this, according to the expression in Buxton v. Lister, would be merely a matter in the way of trade, and in such case it is certain that complete justice might be done by a compensation in damages. But the general rule must be as I have stated.
This dispenses with the necessity of considering some of the other grounds on which the jurisdiction of the Court was attempted to be supported. The other grounds of appeal, as I have before observed, will require but slight notice.
*111 The first and second may be considered together. They are founded upon a misconception of the practice of equity, arguing from analogy to proceedings at law. If a bill appear on the face of it to be prematurely filed, and advantage be taken of this by demurrer, the demurrer will be fatal. If there be no demurrer, and the case be brought to a hearing before the time fixed for the performance of the contract, there might be reason to contend that the bill should be dismissed. But if no advantage be taken by demurrer, and it be not brought to a hearing till the proper time of performance has elapsed, the Court would not do so nugatory a thing as to dismiss the bill in order to compel the party immediately to file another bill for the very same purpose. Equity can do full justice to the parties by preventing surprise and imposing costs on the parties by whose fault they were prematurely and unnecessarily incurred. But this bill was not prematurely filed with respect to the object which the parties then had in view — the preventing of the sale of the slaves. Coming for this purpose, as the time of performance was on the eve of arriving, it was proper that all the matters in controversy should be brought forward to prevent multiplicity of litigation. The leave to amend was matter of discretion, and we think it was properly exercised.
*There is nothing in the third ground as respects either the r*^gg law or the fact: the agreement was received in evidence, without *- any objection (so far as appears from the report of the Judge) to the proof of its execution. No doubt seems to have been seriously entertained of the fact of its execution by Reuben Sims, and if there were any such casual omission, .as is supposed, we should certainly send the cause back that the defect might be supplied.
The fourth and fifth grounds may be taken together. The objection seems to be, that it does not appear that Nathan Sims, who is alleged to have offered payment of the money, was the authorized agent of the plaintiffs. There was no need of any such proof. Any one who would offer to pay the money in their behalf was agent enough, and they might adopt his act.' Besides, most of the plaintiffs were infants, incapable of appointing an agent, and no other agent than such a voluntary one could have been contemplated by the agreement.
With respect to the fact of the money having been offered, it was matter of evidence'for the Chancellor. Even at law, if a debtor.has the money ready, and informs his creditor that he is ready to pay him, and the creditor declares beforehand that he will not receive it, there is no need to prove a formal tender. It is argued that the answer denies the offer, and that it is only proved (and that imperfectly) by the testimony of a single witness, Boyce. I think the answer is equivocal, and, so far from contradicting, supports the testimony of Boyce. The defendant denies “that the said Reuben Sims and Ms children, or either of them, did, at the time that the said contract was to be performed, offer to perform their part of the same, according to the promise thereof. This defendant not knowing that there was any agent of the said children, or who he was, neither does he believe that there was any such person legally to act for the said children, Sc.” He plainly appears to rest his denial that Reuben Sims, or his children, offered performance, on his own conclusion that there was no person legally authorized to offer performance on their behalf. Such a method of answering cannot be too *112 strongly censured. It is generally an attempt to gain the benefit of falsehood, without being subject to the direct charge of it.
With respect to the seventh ground, the Chancellor’s reasoning is entirely satisfactory. The Court refuses to enforce the specific performance *7 301 aS'reements, on the grounds of inadequacy of consideration,* -I because it infers that there must be hardship, injustice or mistake. But if the testator, having purchased the property of plaintiffs’ father, at a low price, chooses out of humanity to give them the benefit of it, upon being reimbursed what he has paid with interest, the whole doctrine is inapplicable. As the hire stipulated to be paid after the 1st of January, 1828, exceeds the interest to be received by the estate of Stevens, in order to make out an enormous inadequacy, calculations were entered into for the purpose of showing that if the period of performance should be deferred for some time, the debt to Stevens’ estate will be extinguished by that excess; so that, in fact, the estate of Stevens will receive nothing. But this also is founded in misconception. If the estate pays hire, it receives the service of the slaves, and we must suppose the one to be equivalent to the other. Then, if this be so, though the debt should be entirely extinguished, all that we can say is, that it has been paid in the services of slaves, instead of money. If the services be in fact equivalent to the hire, the estate will be in' no worse condition than if the contract had been performed at the day. If the defendants be entitled to the performance of the contract, they have been deprived of the services of the slaves from that day.
Under the eighth ground, the want of mutuality in the contract is relied on ; that is to say, that defendant’s testator could not have enforced performance against the plaintiffs, who were no parties to the contract. There can be no doubt but that Reuben Sims and the testator were bound at law. In Lowther v. Carrill, 1 Vern. 521, it was held to be sufficient if the writing be signed by the party, who sought to be charged by the bill, and such is said to have been the case of Hatton v. Grey, 2 Ch. Ca. 164. This was denied, however, by Lord Redesdale, in Lawrenson v. Butler, 1 Sch. & Lef. 20, and in Shannon v. Bradstreet, lb. 58, in which he holds that both parties must be bound, or the Court will not enforce the performance. But he makes the exception expressly in the case of infants. “It is the peculiar privilege of infants for their protection, that though they are not bound, yet those who enter into contracts with them shall be bound, if it be prejudicial to the infant to rescind the contract.” See also Campbell v. Leach, Amb. 747, quoting Holt v. Ward, Fitz. 215. Most of the plaintiffs were infants at the time of the contract, and under the exception entitled to performance. But the contract is one and entire, and must be performed entirely or not at all.
*14.01 *The ninth ground is also misconceived. As between Reuben -* Sims and defendant’s testator the remedy was only at law, and at law there would be no question of solvency or insolvency, with reference to the validity of the contract. In equity, there have been some cases in which the Court has refused to enforce specific performance of a contract for a lease, on the ground of the tenant’s insolvency. Buckland v. Hall, 8 Ves. 92; O’Herlihy v. Hedges, 1 Sch. & Lef. 123. This was on the ground that the insolvency of the tenant might endanger the future payments of rent; and more especially where money was to be laid out *113 by the tenant in repairs or improvements. But it is distinguished from the case of a contract to purchase, because, in such case, it is said, the bill tenders the purchase money, and the Court will not decree a title to be made until the purchase money is paid, or secured to be paid. The insolvency of the vendee is therefore immaterial. But in this case, by the terms of the contract, the slaves are not to be transferred till the money is paid, and if it were not so, the Court would take care that it should be paid or secured.-
With respect to the uncertainty which is supposed to render the contract void, it may be sufficient to observe that there is no uncertainty in the contract in which the plaintiffs are concerned. The terms on which the slaves are to be transferred to them, are perfectly certain ; but there is a distinct stipulation, entirely independent of this contract, by which Reuben Sims covenants “to pay the said E. Stevens for his trouble and expense for attending to a law suit, what any two or three good disinterested men shall say it is worth.” This is the personal undertaking of Reuben Sims, on which the remedy could only be at law. No doubt separate contracts may be contained in the same instrument, and this may be so regarded. Certainly it is no part of the contract'with the plaintiffs. The, Chancellor’s decree is affirmed.
Johnson and O’Neall, Js., concurred.